# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF TEXAS
# WACO DIVISION

**ACQUANLAN DEONSHAY HARRIS,**　　　Case No. 6:20-cv-00271

　　　　　Plaintiff,　　　　　　　Judge Alan D. Albright

　　v.

**CENLAR, FSB,**

　　　　　Defendant.

---

## COMPLAINT FOR DAMAGES WITH JURY DEMAND

Plaintiff Acquanlan DeonShay Harris, through counsel, state as follows for her Complaint against Defendant Cenlar, FSB:

## PARTIES, JURISDICTION, AND VENUE

1.　　Plaintiff Acquanlan Deonshay Harris ("Plaintiff" or "Harris") is the owner of residential real property and improvements thereupon, located at and commonly known as 5007 Colorado Drive, Killeen, TX 76542 (the "Home").

2.　　Harris served our country in the armed forces from November 1999 until her medical discharge from the Army in June 2002.

3.　　The United States Veterans' Administration has determined Harris to be ninety percent (90%) disabled as she suffers from severe respiratory issues, severe allergies, asthma, and migraines and suffers from medical issues related to her hips, back, and knees.

4.　　Harris's disability is of such severity that she has been unable to work since September 2017 and her entire income comes from her VA disability benefits and child support payments from her ex-husband.

5.      Harris currently maintains the Home as her primary, principal residence and has maintained the Home as such at all times relevant to the allegations of this Complaint.

6.      Defendant Cenlar, FSB ("Defendant" or "Cenlar") is a corporation headquartered in Ewing, New Jersey and is a current servicer of a note (the "Note") and of a mortgage on the Home that secures said note (the "Mortgage") each executed by Harris and her ex-husband on or about January 19, 2005 (collectively, the "Loan").

7.      Upon information and belief, CitiMortgage, Inc. ("CitiMortgage") is the current creditor, owner, and/or assignee of the Loan.

8.      CitiMortgage serviced the Loan at all times relevant to this complaint until servicing rights to the Loan transferred to Cenlar effective April 1, 2019.

9.      The Loan is guaranteed by the Department of Veteran's Affairs (VA) and is subject to the regulations of the VA, 12 C.F.R. § 34.4201, *et seq*.

10.     Cenlar does business in the state of Texas and is licensed to do business in the state of Texas as a foreign corporation.

11.     This Court has jurisdiction pursuant to 28 U.S.C. § 1331 and 15 U.S.C. § 1692k(d) as this action arises under the Dodd-Frank Wall Street Reform and Consumer Protection Act (DFA), the Real Estate Settlement Procedures Act, 12 U.S.C. §§ 2601, *et seq*. (RESPA) and the Fair Debt Collection Practices Act (FDCPA), 15 U.S.C. §§ 1692k(d), *et seq.*

12.     This action is filed primarily to enforce regulations promulgated by the Consumer Finance Protection Bureau (CFPB) and implemented pursuant to section 6(f) of RESPA which became effective on January 10, 2014, specifically, 12 C.F.R. § 1024.41 of Regulation X.

13.     This Court has supplemental jurisdiction to hear all state law claims pursuant to 28 U.S.C. § 1367.

14.     This District is an appropriate venue pursuant to 28 U.S.C. § 1391(b) as Harris purchased the Home for her primary residence within this District, Cenlar does business in this District, and the conduct complained of occurred primarily within this District.

## SUMMARY OF CLAIMS

15.     In January 2013, the CFPB issued a number of final rules concerning mortgage markets in the United States, pursuant to the DFA, Public Law No. 111-203, 124 Stat. 1376 (2010).

16.     Specifically, on January 17, 2013, the CFPB issued the RESPA (Regulation X) Mortgage Servicing Final Rules, 78 F.R. 10695 (February 14, 2013), which became effective on January 10, 2014.

17.     The Loan is a "federally related mortgage loan" as defined by 12 C.F.R. § 1024.2(b).

18.     Cenlar is subject to the aforesaid Regulations and does not qualify for the exception for "small servicers", as defined in 12 C.F.R. § 1026.41(e)(4), nor the exemption for a "qualified lender", defined in 12 C.F.R. § 617.7000.

19.     Harris has a private right of action under RESPA pursuant to 12 U.S.C. § 2605(f) for the claimed breaches which provides for remedies including actual damages, costs, statutory damages, and attorneys' fees.

20.     Harris asserts claims for relief against Cenlar for violating 12 U.S.C. § 2605(k)(1)(C) and (E) for breaches of 12 C.F.R. §§ 1024.35 and 1024.41 under Regulation X as set forth, *infra*.

21.     Harris is a "consumer", as that term is defined by 15 U.S.C. § 1692a(3), and a person affected by a violation of the FDCPA, and other violations, with standing to bring this claim under 15 U.S.C. §§ 1692, *et seq.*

22.   Cenlar is a "debt collector" as defined by 15 U.S.C. § 1692a(6) as Cenlar began collecting on the Loan when the Loan was in default.

23.   The Loan is a "debt" as that term is defined by the FDCPA as the underlying debt sought to be collected by Cenlar was a residential mortgage the primary purpose of which was for personal, family, or household use.

## STATEMENT OF FACTS

24.   Primarily as a result of her limited income stemming from her disability, Harris fell behind on her obligations on the Loan and a non-judicial foreclosure sale of the Home was scheduled to occur in March 2019.

25.   Harris filed for bankruptcy relief under Chapter 7 of the United States Bankruptcy Code on or about March 1, 2019 with the assistance of counsel (the "Chapter 7 Bankruptcy").

26.   Harris's counsel sent correspondence dated March 1, 2019 to Hughes, Watters & Askanase, LLP, counsel for CitiMortgage, the prior servicer of the Loan, advising them of the filing of the Bankruptcy and of their obligation to stay the scheduled sale of the Home pursuant of the filing. *See*, Exhibit 1.

27.   Effective April 1, 2019, servicing rights to the Loan transferred from CitiMortgage to Cenlar. *See*, Exhibit 2.

28.   Harris received a discharge in the Chapter 7 Bankruptcy on or about June 6, 2019.

29.   On June 5, 2019, Harris, through counsel submitted a loss mitigation application to Cenlar ("Application #1"). *See*, Exhibit 3.

30.   Application #1 included a complete copy of Harris's divorce decree and related relevant documents evidencing that Harris received ownership of the Home from her ex-husband

through the decree and that Harris's ex-husband would not be a part of the modification application process.  *See*, id.

31.    Receiving no word from Cenlar, in or around the middle of June 2019, a paralegal for Harris's counsel contacted Cenlar to receive a status update for the Modification and a Cenlar representative informed that Harris's ex-husband would need be a party to Application #1.

32.    In response to Cenlar's claim regarding Harris's ex-husband, Harris's counsel sent correspondence dated June 18, 2019 to Cenlar stating that Harris was divorced and that her ex-husband executed a quit-claim deed transferring ownership of the Home to Harris. *See*, Exhibit 4.

33.    On or about June 28, 2019 Cenlar informed a paralegal for Harris's counsel that Application #1 was incomplete because Harris did not sign the hardship affidavit, however, Harris not only executed her hardship affidavit, but had her signature notarized. *See*, Exhibit 3.

34.    Despite Cenlar's misinformation regarding Harris's hardship affidavit, Harris, through counsel, resubmitted the executed hardship affidavit to Cenlar on June 28, 2019. *See*, Exhibit 5.

35.    In or around the middle of July 2019, a paralegal of Harris's counsel again telephoned Cenlar for a status update on Application #1 and a Cenlar representative informed them that Application #1 was incomplete as Harris's ex-husband was not a party to the Application.

36.    On or about July 22, 2019, Harris's counsel sent correspondence to Cenlar again advising Cenlar that Harris was divorced, that Harris was awarded the Home in the divorce decree, and that Harris's ex-husband transferred ownership of the Home to Harris through a recorded quit-claim deed. *See*, Exhibit 6.

37.    Cenlar sent correspondence dated August 16, 2019 directly to Harris, despite prior requests that Cenlar communicate with Harris through her counsel, requesting additional

documents to supplement or otherwise complement Application #1 with a deadline of September 15, 2019. *See* Exhibit 7; *see also*, Exhibits 3, 4, 5, and 6.

38.      At the time of Cenlar's August 16, 2019 correspondence, Harris was away from the Home with her mother, who was hospitalized at the time.

39.      On or about September 11, 2019, upon Harris's return to the Home, Harris responded to Cenlar's August 16, 2019 correspondence, fully responding to each of Cenlar's requests and, in a good faith attempt to move the modification process forward, a new, complete application. *See*, Exhibit 8.

40.      Cenlar was in possession of a complete response to its August 15, 2019 correspondence on or around September 11, 2019. *See*, id.

41.      On September 17, 2019, Cenlar sent correspondence to Harris stating that Harris failed to provide the documentation and information requested through Cenlar's August 16, 2019 correspondence and, accordingly, that Cenlar would "no longer continue processing your application" (the "Closing Notice"). *See*, Exhibit 9.

42.      On or about September 27, 2019, Harris sent correspondence captioned "Notice of Error Pursuant to 12 C.F.R. §1024.35" ("NOE #1") to Cenlar at the address Cenlar established which borrowers must use to submit notices of error and requests for information to Cenlar pursuant to 12 C.F.R. §§ 1024.35(c) and 1024.36(b) (the "Designated Address") via Certified U.S. Mail [Tracking Nos. 9590940240818092528106 and 70143490000199299690]. *See*, Exhibit 10.

43.      Through NOE #1, Harris stated that Cenlar committed errors regarding the Loan by:

a. Improperly claiming through the Closing Notice that Harris's Application was incomplete and that Harris failed to comply with Cenlar's requests in this August 16, 2019 correspondence prior to the deadline established therein; and,

b. In continuing to send correspondence directly to Harris despite repeated requests to send all communications through Harris's counsel.

*See*, id.

44.    On September 27, 2019, Harris, through counsel, further submitted a new loss mitigation application to Cenlar via facsimile transmission to (609) 718-2655 ("Application #2"). *See*, Exhibit 11.

45.    On September 29, 2019, Cenlar sent correspondence acknowledging receipt of Application #2 stating that "[w]ithin 5 business days, we will review the documentation you provided and notify you by mail if further information is needed." *See*, Exhibit 12.

46.    Harris did not receive any correspondence from Cenlar sent within five (5) business days of September 29, 2019 requesting further information regarding Application #2.

47.    As of September 29, 2019, there was no foreclosure sale of the Home scheduled to occur.

48.    Cenlar received NOE #1 at the Designated Address on September 30, 2019. *See*, Exhibit 13.

49.    On or about October 1, 2019, Hughes, Watters & Askanase, LLP sent correspondence on behalf of CitiMortgage to attempt to arrange an inspection of the Home due to the "possibility of a foreclosure action in the near future". *See*, Exhibit 14.

50.    On or about October 3, 2019, Cenlar posted the Home for a non-judicial foreclosure sale on November 5, 2019.

51.     Cenlar sent correspondence to Harris dated October 7, 2019 acknowledging receipt of NOE #1. *See*, Exhibit 15.

52.     On October 11, 2019, Harris sent correspondence captioned "Notice of Error Pursuant to 12 C.F.R. §1024.35" ("NOE #2") to Cenlar at the Designated Address via Certified U.S. Mail [Tracking Nos. 7011818300000303630770 and 9590940249349063099529]. *See*, Exhibit 16.

53.     Through NOE #2, Harris stated that Cenlar committed errors regarding the Loan by scheduling and posting Home for sale on November 5, 2019 despite Cenlar's receipt of a facially complete or complete loss mitigation application on September 29, 2019. *See*, id.

54.     On October 23, 2019, Cenlar sent correspondence to Harris regarding Application #2 stating "we are unable to complete a review of the application and fully evaluate you for a homeowner assistance program because the application was received less than 15 days prior to the scheduled foreclosure sale on 11/05/2019." *See*, Exhibit 17.

55.     On or about October 30, 2019, Cenlar sent correspondence in response to NOE #1 and NOE #2 ("Response #1"). *See*, Exhibit 18.

56.     Through Response #1, Cenlar claimed that there was no error in relation to the Closing Notice as alleged through NOE #1, as Cenlar claimed that Harris failed to comply with one of the requests contained in Cenlar's August 16, 2019 correspondence, specifically:

> Other Requirement: Student Loans (Your credit report reflects multiple student loans that may not have been included on your Uniform Borrower Assistance Form. Please confirm the current status of these loans and whether or not you are making payments. If they are deferred or in an active forbearance, please provide evidence of such. If you are currently making payments, please provide the most recent statement or a signed/dated letter reflecting your monthly payment obligation.)

*See*, id.

57.     Contrary to the allegations in Response #1, however, Harris had provided the requested information regarding Harris's student loans in the correspondence dated September 11, 2019, stating:

> Ms. Harris is a Disabled Veteran. She has a 90% disability rating from the U.S. Department of Veteran's Affairs. Once she obtains that 100% disability rating, her student loans will be discharged. The loans are currently in deferment while the disability rating increase is being processed through the VA. Therefore, she makes no student loan payments due to the deferment and will not make any student loan payments once they are discharged when she receives her 100% disability rating.

*See*, Exhibit 8.

58.     Through Response #1, Cenlar claimed that there was no error in relation to "dual-tracking" as alleged through NOE #2 because:

> On September 29, 2019, it has been identified that a loss mitigation package has been received. However, according to the Code of Federal Regulations ("CFR") 12 CFR 1024.41(g), if a servicer receives a complete loss mitigation package more than 37 days before a foreclosure sale, a servicer shall not move for foreclosure judgment or order of sale, or conduct a foreclosure sale. A review of the loan indicates an incomplete loss mitigation package was received 36 days before the scheduled foreclosure sale date of November 5, 2019. For that reason we are not required to postpone any foreclosure.

*See*, Exhibit 18.

59.     Cenlar's response regarding "dual-tracking" misinterprets and misapplies 12 C.F.R. 1024.41 as Application #2 was submitted *prior* to a sale being scheduled[1] and, since Cenlar did not request any missing documents or information through the notice required by 12 C.F.R. §

---

[1] The Official CFPB Interpretation of 12 C.F.R. § 1024.41(b)(3) provides "*Foreclosure sale not scheduled.* If no foreclosure sale has been scheduled as of the date that a complete loss mitigation application is received, the application is considered to have been received more than 90 days before any foreclosure sale." Supplement I to Part 1024.

1024.41(b)(2)(i)(B)[2], Application #2 was deemed to be facially complete and therefore complete for the purposes of 12 C.F.R. § 1024.41(f) as September 29, 2019, the date Cenlar received Application #2, until Harris had a reasonable opportunity to complete the application.[3]

60.     Through Response #1, Cenlar failed to address the alleged error regarding its failure to send communications to Harris through Harris's counsel as alleged through NOE #1. *See*, Exhibits 10 and 18.

61.     Cenlar failed to provide a proper response to NOE #1 and NOE #2 and failed to perform a reasonable investigation into the errors alleged through the same.

62.     On November 4, 2019, Harris sent correspondence captioned "Notice of Error Pursuant to 12 C.F.R. §1024.35" ("NOE #3") to Cenlar at the Designated Address via Certified U.S. Mail [Tracking Nos. 70143490000199306633 and 9590940240758092627389]. *See*, Exhibit 19.

---

[2] "If a servicer receives a loss mitigation application 45 days or more before a foreclosure sale, a servicer shall: (A) Promptly upon receipt of a loss mitigation application, review the loss mitigation application to determine if the loss mitigation application is complete; and (B) Notify the borrower in writing within 5 days (excluding legal public holidays, Saturdays, and Sundays) after receiving the loss mitigation application that the servicer acknowledges receipt of the loss mitigation application and that the servicer has determined that the loss mitigation application is either complete or incomplete. If a loss mitigation application is incomplete, the notice shall state the additional documents and information the borrower must submit to make the loss mitigation application complete and the applicable date pursuant to paragraph (2)(ii) of this section. The notice to the borrower shall include a statement that the borrower should consider contacting servicers of any other mortgage loans secured by the same property to discuss available loss mitigation options." 12 C.F.R. § 1024.41(b)(2)(i).

[3] "A loss mitigation application shall be considered facially complete when a borrower submits all the missing documents and information as stated in the notice required under paragraph (b)(2)(i)(B) of this section, when no additional information is requested in such notice, or once the servicer is required to provide the borrower a written notice pursuant to paragraph (c)(3)(i) of this section. If the servicer later discovers that additional information or corrections to a previously submitted document are required to complete the application, the servicer must promptly request the missing information or corrected documents and treat the application as complete for the purposes of paragraphs (f)(2) and (g) of this section until the borrower is given a reasonable opportunity to complete the application. If the borrower completes the application within this period, the application shall be considered complete as of the date it first became facially complete, for the purposes of paragraphs (d), (e), (f)(2), (g), and (h) of this section, and as of the date the application was actually complete for the purposes of this paragraph (c). A servicer that complies with this paragraph will be deemed to have fulfilled its obligation to provide an accurate notice under paragraph (b)(2)(i)(B) of this section." 12 C.F.R. § 1024.41(c)(2)(iv).

63.     Through NOE #3, Harris stated that Cenlar committed errors regarding the Loan by sending the Refusal Notice despite Cenlar having been in possession of a facially complete or complete application prior to the scheduling of the foreclosure sale, contrary to the allegations in the Refusal Notice. *See*, id.

64.     In order to avoid the sale of the Home, Harris had no other option but to file for bankruptcy relief under Chapter 13 of the United States Bankruptcy Code on or about November 4, 2019 (the "Chapter 13 Bankruptcy").

65.     Cenlar sent correspondence to Harris in response to NOE #3 dated December 5, 2019, stating that its position related to the errors alleged through NOE #2 and NOE #3 remained unchanged ("Response #2"). *See*, a copy of Response #2, attached as Exhibit 20.

## IMPACT UPON AND DAMAGE TO PLAINTIFF

66.     Throughout this entire ordeal, Harris has simply wanted her loan servicer to conduct a review of her eligibility for all loss mitigation options available to them in an effort to save her Home via the best option available to them, to protect her from the risk of foreclosure, to responsibly resume her mortgage payments, and to begin the lengthy process of rehabilitating her credit.

67.     Cenlar's actions have caused Plaintiff to: (1) Spend significant time and resources gathering duplicative documents and filling out duplicative forms in completing her loss mitigation application; (2) spend money on paper, postage and legal fees to compile and send such submissions to Cenlar; (3) incur legal fees and expenses to draft and mail notices of error via Certified U.S. Mail to seek Cenlar's compliance with her obligations under Regulation X to ensure that Harris's loss mitigation applications be properly reviewed for eligibility for all loss mitigation options available to her.

68.     Through no fault of Plaintiff, Cenlar failed to properly evaluate Plaintiff's Application, made false statements in connection with its communications to Plaintiff, and failed to correct errors when given the opportunity to do so, thereby denying Harris the opportunity to have her Loan properly and timely considered for alternatives to foreclosure.

69.     Because of Cenlar's actions, Harris had no other option to save her home but to file the Chapter 13 Bankruptcy and incurring legal fees, costs, and fees for the same, the filing of which will be a permanent public record and will impair Harris's ability to be approved for credit and or to obtain favorable credit terms in the future.

70.     Due to the necessity of filing the Chapter 13 Bankruptcy as a result of Cenlar's actions, Harris's monthly payment to Cenlar for the Loan has effectively increased from approximately $1,100.00 per month to approximately $2,250.00 per month, leaving her with minimal funds for living expenses due to her limited income as described, *supra*.

71.     If not for having to seek legal counsel to attempt to save her Home as a result of Cenlar's actions, Harris would stay confined to her Home due to her severe respiratory issues as even high pollen counts or contraction of a common cold can place Harris into severe respiratory distress, but, due to Cenlar's actions, Harris is caused to put her life and well-being at risk to have contact with counsel and its staff who come into contact with many clients.

72.     Cenlar's actions, and the resulting decline Harris's expendable income and fear of losing her Home, have further caused Harris to suffer from extreme anxiety resulting in countless anxiety and panic attacks since Cenlar's improper handling of the loss mitigation process for the Loan which has necessitated increasing the dosage of Harris's two previously prescribed anxiety medications and the prescription of three additional medications to treat said anxiety.

73.     Cenlar's actions have precluded Harris from her erstwhile efforts to put her

financial difficulties behind them, start fresh, and begin to rehabilitate her credit standing.

74.    Cenlar's conduct has had a severe impact on Harris, emotionally, physically, and financially.

75.    Cenlar's servicing errors and indifference to the same have had a major impact on Harris as she has been consumed by worry and frustration over the status of the Loan.

## COUNT ONE:
## VIOLATION OF 12 C.F.R. § 1024.41(b)(1)

### (Failure to exercise reasonable diligence to complete Application #1)

76.    Harris restates and incorporates all the statements and allegations contained in paragraphs 1 through 75 in their entirety, as if fully rewritten herein.

77.    12 C.F.R. § 1024.41(a) explicitly provides that "[a] borrower may enforce the provisions of this section pursuant to section 6(f) of RESPA (12 U.S.C. §2605(f))".

78.    12 C.F.R. § 1024.41(b)(1) provides that "[a] servicer shall exercise reasonable diligence in obtaining documents and information to complete a loss mitigation application."

79.    Comment 1 of the Official Interpretations of the CFPB to 12 C.F.R. § 1024.41(b)(2)(i)(B) provides that "[e]ven if a servicer has informed a borrower that an application is complete (or notified the borrower of specific information necessary to complete an incomplete application), if the servicer determines, in the course of evaluating the loss mitigation application submitted by the borrower, that additional information or a corrected version of a previously submitted document is required, the servicer must promptly request the additional information or corrected document from the borrower pursuant to the reasonable diligence obligation in § 1024.41(b)(1)." Supplement I to Part 1024.

80.    Comment 1 of the Official Interpretations of the CFPB to 12 C.F.R. § 1024.41(b)(3) provides that if no foreclosure sale is scheduled as of the date a loss mitigation application is

received, the application is considered to have been received more than ninety (90) days before any foreclosure sale. Supplement I to Part 1024.

81.     Harris submitted Application #1 on June 5, 2019 which included a complete copy of Harris's divorce decree and related relevant documents evidencing that Harris received ownership of the Home from her ex-husband through the decree and that Harris's ex-husband would not be a part of the modification application process. See, Exhibit 3.

82.     Through the loss mitigation process involving Application #1, Cenlar would routinely request information that was already in Cenlar's possession requiring Harris and her counsel to expend time and resources to submit duplicative and unnecessary documents to Cenlar.

83.     Despite the divorce related materials submitted with Application #1, Cenlar claimed that Harris's ex-husband would have to be a party to Application #1 which required Harris to send correspondence again indicating that Harris was divorced and that her ex-husband executed a quit-claim deed transferring ownership of the Home to Harris. See, Exhibits 3 and 4.

84.     On June 28, 2019, Cenlar incorrectly claimed that Harris did not execute the hardship affidavit when Harris not only executed the same, but had her signature notarized, which required Harris and her counsel to expend time and resources to resend the executed hardship affidavit. See, Exhibits 3 and 5.

85.     Weeks later, in the middle of July 2019, Cenlar again informed a paralegal of Harris's counsel that Application #1 was incomplete as Harris's ex-husband was not a party to Application #1, again requiring Harris to send correspondence again indicating that Harris was awarded the Home in the divorce decree, and that Harris's ex-husband transferred ownership of the Home to Harris through a recorded quit-claim deed. *See*, Exhibit 6.

86.     Even upon Harris's submission of all information requested by and through Cenlar's August 16, 2019 correspondence on or about September 11, 2019, Cenlar sent the Closing Notice on September 17, 2019 stating that Harris failed to send the requested information. See, Exhibits 7, 8, and 9.

87.     As described *supra*, Cenlar failed time and time again to exercise reasonable diligence in collecting documents and information necessary to complete the Plaintiff's loss mitigation application, in violation of 12 C.F.R. §1024.35(b)(1).

88.     Cenlar's actions are part of a pattern and practice of behavior in conscious disregard for Harris's rights.

89.     Cenlar's conduct as pled, *supra*, is outrageous, wanton, willful, and shows a conscious disregard for Harris's rights.

90.     As a result of Cenlar's actions, Cenlar is liable to Harris for statutory damages and actual damages as further described, *supra*. 12 U.S.C. § 2605(f)(1).

91.     Additionally, Harris requests reasonable attorneys' fees and costs incurred in connection with this action. 12 U.S.C. § 2605(f)(3).

## COUNT TWO:
## VIOLATION OF 12 C.F.R. § 1024.41(b)(2)(i)

**(Failure to promptly review Application #2 to determine whether complete and notify Harris within five (5) business days whether any further information is required to complete Application #2)**

92.     Harris restates and incorporates all the statements and allegations contained in paragraphs 1 through 75 in their entirety, as if fully rewritten hereon.

93.     12 C.F.R. § 1024.41(a) explicitly provides that "[a] borrower may enforce the provisions of this section pursuant to section 6(f) of RESPA (12 U.S.C. §2605(f))".

94.   12 C.F.R. § 1024.41(b)(2)(i) provides that if a servicer receives a loss mitigation application at least forty-five (45) days before a foreclosure sale, they must:

(A) Promptly upon receipt of a loss mitigation application, review the loss mitigation application to determine if the loss mitigation application is complete; and

(B) Notify the borrower in writing within 5 days (excluding legal public holidays, Saturdays, and Sundays) after receiving the loss mitigation application that the servicer acknowledges receipt of the loss mitigation application and that the servicer has determined that the loss mitigation application is either complete or incomplete. If a loss mitigation application is incomplete, the notice shall state the additional documents and information the borrower must submit to make the loss mitigation application complete and the applicable date pursuant to paragraph (2)(ii) of this section. The notice to the borrower shall include a statement that the borrower should consider contacting servicers of any other mortgage loans secured by the same property to discuss available loss mitigation options.

95.   Comment 1 of the Official Interpretations of the CFPB to 12 C.F.R. § 1024.41(b)(2)(i) provides that "[f]or purposes of § 1024.41(b)(2)(i), if no foreclosure sale has been scheduled as of the date a servicer receives a loss mitigation application, the servicer must treat the application as having been received 45 days or more before any foreclosure sale." Supplement I to Part 1024.

96.   Harris submitted Application #2 to Cenlar on September 27, 2019 via facsimile transmission to (609) 718-2655. *See*, Exhibit 11.

97.   As of September 27, 2019, there was no foreclosure sale of the Home scheduled so Cenlar was required to treat the Application as received at least forty-five (45) days prior to any sale.

98.   Pursuant to 12 C.F.R. § 1024.41(b)(2)(i), Cenlar to promptly review Application #2 to determine whether Application #2 was complete and sent written notice to Harris within five

(5) business days of September 27, 2019 whether any further information was required to complete Application #2.

99.     Cenlar sent correspondence dated September 29, 2019 acknowledging receipt of Application #2 stating that "[w]ithin 5 business days, we will review the documentation you provided and notify you by mail if further information is needed." *See*, Exhibit 12.

100.    Rather than sending the notice referenced by the September 29, 2019 correspondence and otherwise required by 12 C.F.R. § 1024.41(b)(2)(i), Cenlar subsequently instead posted the Home for sale to occur in fewer than forty-five (45) days and sent the Refusal Notice.

101.    Cenlar's actions in failing to comply with 12 C.F.R. § 1024.41(b)(2)(i) for Application #2 which was received when there was no foreclosure sale of the Home scheduled and instead quickly scheduling a sale in a clear attempt to circumvent its obligations under Regulation X constitute a violation of 12 C.F.R. § 1024.41(b)(2)(i).

102.    Cenlar's actions are part of a pattern and practice of behavior in conscious disregard for Harris's rights.

103.    Cenlar's conduct as pled, *supra*, is outrageous, wanton, willful, and shows a conscious disregard for Harris's rights.

104.    As a result of Cenlar's actions, Cenlar is liable to Harris for statutory damages and actual damages as further described, *supra*. 12 U.S.C. § 2605(f)(1).

105.    Additionally, Harris requests reasonable attorneys' fees and costs incurred in connection with this action. 12 U.S.C. § 2605(f)(3).

## COUNT THREE:
## VIOLATION OF 12 C.F.R. § 1024.41(f)(2)

**(Violation of the prohibition on foreclosure referral after submission of Application #2)**

106.    Harris restates and incorporates all the statements and allegations contained in paragraphs 1 through 75 in their entirety, as if fully rewritten herein.

107.    12 C.F.R. § 1024.41(a) explicitly provides that "[a] borrower may enforce the provisions of this section pursuant to section 6(f) of RESPA (12 U.S.C. §2605(f))".

108.    12 C.F.R. § 1024.41(f)(2) provides:

> If a borrower submits a complete loss mitigation application during the pre-foreclosure review period set forth in paragraph (f)(1) of this section or before a servicer has made the first notice or filing required by applicable law for any judicial or non-judicial foreclosure process, a servicer shall not make the first notice or filing required by applicable law for any judicial or non-judicial foreclosure process unless:
>   (i)   The servicer has sent the borrower a notice pursuant to paragraph (c)(1)(ii) of this section that the borrower is not eligible for any loss mitigation option and the appeal process in paragraph (h) of this section is not applicable, the borrower has not requested an appeal within the applicable time period for requesting an appeal, or the borrower's appeal has been denied;
>   (ii)  The borrower rejects all loss mitigation options offered by the servicer; or
>   (iii) The borrower fails to perform under an agreement on a loss mitigation option.

109.    Harris submitted Application #2 to Cenlar on September 27, 2019 via facsimile transmission to (609) 718-2655. *See*, Exhibit 11.

110.    Cenlar sent correspondence dated September 29, 2019 acknowledging receipt of Application #2 stating that "[w]ithin 5 business days, we will review the documentation you provided and notify you by mail if further information is needed." *See*, Exhibit 12.

111.    Harris did not receive any correspondence from Cenlar sent within five (5) business days of September 29, 2019 requesting further information regarding Application #2. See, supra.

112.    As of September 29, 2019, there was no foreclosure sale of the Home scheduled to occur.

113.    Application #2 was facially complete and therefore complete for the purposes of 12 C.F.R. § 1024.41(f)(2) pursuant to 12 C.F.R.  § 1024.41(c)(2)(iv) as of September 27, 2019, prior to the posting of the Home for sale.

114.    On October 3, 2019, with the facially complete Application #2 pending, Cenlar posted the Home for sale.

115.    Cenlar's actions, in posting the Home for sale on October 3, 2019 while Application #2 was pending, were in violation of 12 C.F.R. § 1024.41(f)(2).[4]

116.    Cenlar's actions are part of a pattern and practice of behavior in conscious disregard for Harris's rights.

117.    Cenlar's conduct as pled, supra, is outrageous, wanton, willful, and shows a conscious disregard for Harris's rights.

118.    As a result of Cenlar's actions, Cenlar is liable to Harris for statutory damages and actual damages as further described, supra. 12 U.S.C. § 2605(f)(1).

---

[4] In Texas, prior to selling a home at sale via a non-judicial foreclosure process, servicers are required to: (1) Send a "Notice of Default and Intent to Accelerate" to the borrower affording an opportunity to cure; and (2) after the cure period runs, send a "Notice of Acceleration and Posting for Foreclosure" with an enclosed notice of foreclosure sale at least twenty-one (21) days prior to the sale and file the notice of foreclosure sale with the county clerk and post the same at the courthouse. Accordingly, the "foreclosure referral" referenced in 12 C.F.R. § 1024.41(f)(2) is the filing of the notice of foreclosure sale with the county clerk which occurred on or after October 3, 2019.  See, Exhibit 15; see also, Supplement I to Part 1024, Comment 1.ii of the Official Interpretations of the CFPB to 12 C.F.R. § 1024.41(f) ("Where foreclosure procedure does not require an action or court proceeding, such as under a power of sale, a document is considered the first notice or filing if it is the earliest document required to be recorded or published to initiate the foreclosure process."

119.     Additionally, Harris requests reasonable attorneys' fees and costs incurred in connection with this action. 12 U.S.C. § 2605(f)(3).

**COUNT FOUR:**
**VIOLATION OF 12 C.F.R. § 1024.35(e) AND 12 U.S.C. §§ 2605(k)(1)(C) AND (E)**

**(Failure to reasonably investigate and properly respond to NOE #1, NOE #2, and NOE #3)**

120.     Harris restates and incorporates all of the statements and allegations contained in paragraphs 1 through 75 in their entirety, as if fully rewritten herein.

121.     12 C.F.R. § 1024.35(a) provides that "[a] servicer shall comply with the requirements of this section for any written notice from the borrower that asserts an error and that includes the name of the borrower, information that enables the servicer to identify the borrower's mortgage loan account, and the error the borrower believes has occurred."

122.     Comment 1 of the CFPB's Official Interpretations of 12 C.F.R. § 1024.35(a) provides that "[a] notice of error is submitted by a borrower if the notice of error is submitted by an agent of the borrower.

123.     Pursuant to 12 C.F.R. § 1024.35(b)(11), the term "error" refers to any error, not otherwise specified in 12 C.F.R. §§ 1024.35(b)(1) to 1024.35(b)(10), committed in regards to the borrower's mortgage loan.

124.     12 C.F.R. § 1024.35(e)(1)(i) provides that a servicer must respond to a notice of error by either:

> (A)   Correcting the error or errors identified by the borrower and providing the borrower with a written notification of the correction, the effective date of the correction, and contact information, including a telephone number, for further assistance; or
>
> (B)   Conducting a reasonable investigation and providing the borrower with a written notification that includes a statement that the servicer has determined that no error occurred, a

statement of the reason or reasons for this determination, a
statement of the borrower's right to request documents relied
upon by the servicer in reaching its determination, information
regarding how the borrower can request such documents, and
contact information, including a telephone number, for further
assistance.

125.    12 U.S.C. § 2605(k)(1)(C) provides that "[a] servicer of a federally related

mortgage shall not...fail to take timely action to respond to a borrower's requests to correct errors

relating to allocation of payments, final balances for purposes of paying off the loan, or avoiding

foreclosure, or other standard servicer's duties."

126.    12 U.S.C. § 2605(k)(1)(E) provides that a servicer of a federally related mortgage

shall not "fail to comply with any other obligation found by the Bureau of Consumer Financial

Protection, by regulation, to be appropriate to carry out the consumer protection purposes of this

chapter."

127.    NOE #1, NOE #2, and NOE #3 (collectively, the "NOEs") each meet the

requirements of a notice of error as defined by 12 C.F.R. § 1024.35(a).  See, Exhibits 10, 16, and

19.

128.    Plaintiff sent each of the NOEs to Cenlar at the Designated Address. See, id.

129.     Through NOE #1, Harris stated that Cenlar committed errors regarding the Loan

by:

    a.    Improperly claiming through the Closing Notice that Harris's Application was
incomplete and that Harris failed to comply with Cenlar's requests in this
August 16, 2019 correspondence prior to the deadline established therein; and,

    b.    In continuing to send correspondence directly to Harris despite repeated
requests to send all communications through Harris's counsel.

See, Exhibit 10.

130.     Through NOE #2, Harris stated that Cenlar committed errors regarding the Loan by scheduling and posting Home for sale on November 5, 2019 despite Cenlar's receipt of a facially complete or complete loss mitigation application on September 29, 2019. *See*, Exhibit 16.

131.     Through NOE #3, Harris stated that Cenlar committed errors regarding the Loan by sending the Refusal Notice despite Cenlar having been in possession of a facially complete or complete application prior to the scheduling of the foreclosure sale, contrary to the allegations in the Refusal Notice. *See*, Exhibit 19.

132.     Pursuant to 12 C.F.R. § 1024.35(e)(3)(i)(C), Cenlar was required to respond to each of the NOEs within thirty (30) business days of its receipt of the same.

133.     Cenlar sent Response #1 on or about October 30, 2019 in response to NOE #1 and NOE #2. See, Exhibit 18.

134.     Response #1 failed to satisfy the requirements of either 12 C.F.R. §§ 1024.35(e)(1)(A) or 1024.35(e)(1)(B). See, id.

135.     Cenlar, through Response #1, did not acknowledge that any of the errors alleged through the NOEs occurred and state the date of the correction of any such errors.  See, id.

136.     Through Response #1, Cenlar claimed that none of the errors alleged through the NOEs occurred. See, id.

137.     Cenlar failed to perform a reasonable investigation into the error related to the sending of the Closing Notice as contrary to the allegations in Response #1 that Harris failed to provide the requested information as to her student loans, Harris had provided such information in the correspondence dated September 11, 2019, stating:

> Ms. Harris is a Disabled Veteran. She has a 90% disability rating
> from the U.S. Department of Veteran's Affairs. Once she obtains
> that 100% disability rating, her student loans will be discharged. The
> loans are currently in deferment while the disability rating increase

is being processed through the VA. Therefore, she makes no student loan payments due to the deferment and will not make any student loan payments once they are discharged when she receives her 100% disability rating.

See, Exhibits 8 and 18.

138.   Cenlar failed to perform a reasonable investigation into the error related to its failure to send communications to Harris through Harris's counsel as alleged through NOE #1 as there is no reference whatsoever to such error in Response #1. See, Exhibit 18.

139.   Cenlar failed to perform a reasonable investigation into the error related to the "dual-tracking" of the Loan as evidenced by Cenlar's response that misinterprets and misapplies 12 C.F.R. 1024.41. See, id.

140.   Contrary to Cenlar's reasoning in Response #1, since Application #2 was submitted *prior* to a sale being scheduled and, since Cenlar did not request any missing documents or information through the notice required by 12 C.F.R. § 1024.41(b)(2)(i)(B), Application #2 was deemed to be facially complete and therefore complete for the purposes of 12 C.F.R. § 1024.41(f) as September 29, 2019, the date Cenlar received Application #2, until Harris had a reasonable opportunity to complete the application and Cenlar engaged in "dual-tracking" by posting the Home to for sale.

141.   Cenlar sent Response #2 on or about December 6, 2019 in response to NOE #3. See, Exhibit 20.

142.   Response #2 failed to satisfy the requirements of either 12 C.F.R. §§ 1024.35(e)(1)(A) or 1024.35(e)(1)(B). See, id.

143.   Cenlar, through Response #2, did not acknowledge that any of the errors alleged through the NOEs occurred and state the date of the correction of any such errors.  See, id.

144.    Through Response #2, Cenlar claimed that none of the errors alleged through the NOEs occurred. See, id.

145.    It is clear that Cenlar failed to perform a reasonable investigation into the errors alleged through NOE #3 as Cenlar's position remained unchanged from Response #1.

146.    Cenlar failed to comply with 12 U.S.C. § 2605(k)(1)(E) in neglecting its obligations pursuant to 12 C.F.R. § 1024.35(e) as to each of the NOEs as described, *supra*.

147.    Cenlar's actions in failing to correct or otherwise perform a reasonable investigation into the errors alleged through each of the NOEs, and  to provide a proper written response to the same, constitute one (1) violation of 12 C.F.R. § 1024.35(e) and 12 U.S.C. §§ 2605(k)(1)(C) and (E) for each of the three (3) NOEs which Cenlar failed to appropriately address.

148.    Cenlar's actions are part of a pattern and practice of behavior in violation of Harris's rights and the rights of other similarly situated borrowers and in violation of Cenlar's obligations under Regulation X.

149.    Cenlar's pattern and practice of behavior in violation of Regulation X is evidenced by its consistent refusal to appropriately respond to and correct the errors Harris brought to its attention through the NOEs, and Harris's other written and verbal communications notifying Cenlar of such errors and seeking correction of the same as further described, *supra*.

150.    As a result of Cenlar's actions, Cenlar is liable to Harris for statutory damages and actual damages as further described, *supra*. 12 U.S.C. § 2605(f)(1).

151.    Additionally, Harris requests reasonable attorneys' fees and costs incurred in connection with this action. 12 U.S.C. § 2605(f)(3).

## **COUNT FIVE:**
## **VIOLATIONS OF THE FDCPA, 15 U.S.C. §§ 1692, *et seq*.**

152.    Harris restates and incorporates all the statements and allegations contained in paragraphs 1 through 75 in their entirety, as if fully rewritten herein.

153.    Harris is a "consumer" as she is a natural person residing in McLennan County, TX and is obligated or allegedly obligated to pay on the Loan sought to be collected by Cenlar. 15 U.S.C. § 1692a(3).

154.    The Loan is a "debt" as Harris obtained the Loan and became obligated thereunder for personal, household, or family use. 15 U.S.C. § 1692a(5)

155.    Cenlar is a "debt collector" as defined by the FDCPA as Cenlar began servicing the Loan at a time when the Loan was in default. 15 U.S.C. § 1692a(6)

156.    Cenlar engaged in the actions described, *supra*, in an attempt to collect a debt represented by the Loan.

157.    As outlined, *supra*, Cenlar violated 15 U.S.C. § 1692c by communicating with Harris in an attempt to collect a debt despite knowing that Harris was represented by counsel and despite Harris's counsel's repeated requests to cease direct communication with Harris.

158.    As outlined, *supra*, Cenlar violated 15 U.S.C. § 1692e by using false or misleading representations to attempt to collect a debt during the loss mitigation process by repeatedly and continuously misrepresenting the status of Application #1 and Application #2 and falsely claiming documents were needed when already having been provided.

159.    As outlined, *supra*, Cenlar violated 15 U.S.C. § 1692f by using unfair or unconscionable means to attempt to collect a debt by posting the Home for foreclosure sale while Application #2 remained pending and by refusing to review Application #1 for Harris's eligibility

for any and all loss mitigation options available despite Harris's submission of all requested information to complete Application #1.

160.    Due to Cenlar's conduct, Harris suffered actual damages, further described, *supra*, including legal fees and expenses to retain counsel to prepare and send the NOEs as well as legal fees and expenses to prepare and file this Complaint to remedy Cenlar's wrongful conduct.

161.    Cenlar's actions directly and proximately caused Harris to suffer from extreme emotional distress driven by the reasonable and legitimate fear that her Home would be sold at foreclosure sale despite her reasonable compliance with all of Cenlar's requests through the loss mitigation process which has resulted in frustration, loss of sleep, anxiety, depression, embarrassment, and other significant emotional distress.

162.    Cenlar, as a result of these actions, is liable to Harris for actual damages as further described, *supra*, statutory damages, and reasonable attorneys' fees and costs.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Acquanlan DeonShay Harris respectfully requests that this Court grant judgment in her favor against Defendant Cenlar, FSB as follows:

A)    A finding that Cenlar violated 12 C.F.R. § 1024.41(b)(1) as alleged in Count One;

B)    A finding that Cenlar violated 12 C.F.R. § 1024.41(b)(2)(1) as alleged in Count Two;

C)    A finding that Cenlar violated 12 C.F.R. § 1024.41(f)(2) as alleged in Count Three;

D)    A finding that Cenlar violated 12 C.F.R. § 1024.35(e) and 12 U.S.C. §§ 2605(k)(1)(C) and (E) as alleged in Count Four;

E)      A finding that Cenlar committed violations of 15 U.S.C. §§ 1692c, 1692e, and/or § 1692f as alleged in Count Five;

F)      For an award of actual damages against Cenlar in an amount to be determined at trial against Cenlar as to Counts One through Five;

G)      For an award of statutory damages against Cenlar in the amount of Two Thousand Dollars ($2,000.00) for each and every violation of RESPA alleged in Counts One through Four;

H)      For an award of statutory damages against Cenlar in the amount of One Thousand Dollars ($1,000.00) for violating the FDCPA as alleged in Count Six;

I)      For an award of reasonable attorneys' fees and costs from Cenlar as alleged in Counts One through Five; and,

J)      For all other relief this Court may deem just and proper.

Respectfully submitted,

Erin B. Shank
ERIN B. SHANK, P.C.
1902 Austin Avenue
Waco, TX 76701
(Phone) 254-296-1161
(FAX) 254-296-1165
shankcourtnoticesonly@gmail.com

Marc E. Dann (OH Bar No. 0039425)
*(Pro Hac Vice Anticipated)*
Dann Law
P.O. Box 6031040
Cleveland, OH 44103
(Phone) 216-373-0539
(FAX) 216-373-0536
notices@dannlaw.com

*Counsel for Plaintiff Acquanlan Deonshay Harris*

## DEMAND FOR JURY TRIAL

Plaintiff Acquanlan DeonShay Harris demands a jury trial on all causes of action and claims with respect to which she has a right to a jury trial.

_____

Erin B. Shank
ERIN B. SHANK, P.C.

*Counsel for Plaintiff Acquanlan Deonshay Harris*